EDWARD P. BRAY, President, etc., Respondent, *v.* JOHN V. FARWELL, Appellant.

The articles of association of an unincorporated joint-stock company bear the same relation to it that the charter bears to an incorporated company ; they regulate the duties of the officers and the duties and obligations of the members among themselves.

*Prima facie* the shareholders of such a company are not bound to pay assessments upon their stock until the whole capital of the company has been subscribed for.

In the absence of a provision in the articles authorizing the company to proceed to business and to levy assessments upon a partial filling up of its capital and before the entire stock is taken up, it is necessary, in order to charge an individual subscriber for an assessment before the whole stock is taken, to show that he has waived his rights to insist upon that condition by his own acts.

By the articles of association of a joint-stock association its capital was fixed at $3,000,000, divided into 30,000 shares. It was provided that the number of shares might be increased or diminished by resolution of the board of directors, and the shares were each made subject to assessments to pay liabilities, etc., which the shareholders agreed to pay. There was no provision authorizing the commencement of business until the whole capital stock was subscribed for and taken. About 15,000 shares were subscribed for, upon which only $50 per share was required to be paid, for which certificates for full-paid stock were issued. Business was commenced and in a few months an assessment was made by the directors upon the stockholders of $40 per share to meet liabilities. In an action against defendant, who owned a number of shares, to recover the assessment thereon, it did not appear that defendant ever attended a meeting of the stockholders, or assented in any way to the commencement or prosecution of business before all the shares were taken, or that he knew before the assessment was made that they had not been taken. *Held*, that he was not bound by the acts of the directors and was not

liable ; also, that defendant, by dealing with his stock, did not incur the obligation sought to be enforced or preclude himself from making or contesting the assessment.

(Argued June 8, 1880 ; decided September 21, 1880.)

APPEAL from judgment of the General Term of the Supreme Court, in the first judicial department, affirming a judgment in favor of plaintiff entered upon the report of a referee.

This action was brought by plaintiff as president of the Butterfield Despatch, a joint-stock company, to collect an assessment upon certain shares of the stock of the company owned by defendant.

The material facts are set forth in the opinion.

*Samuel Hand* for appellant. At common law joint-stock companies are not distinguishable from partnerships. The members are subject to all the liabilities and rules that affect partnerships. (Lindley on Partnerships, 300, 409 ; *Townsend v. Goewy*, 19 Wend. 424 ; *Cross v. Jackson*, 5 Hill, 478.) A partnership of "natural persons" could not maintain the suit at bar. ( *Westcott v. Fargo*, 61 N. Y. 548 ; Lindley on Partnership, *718 to 723.) There is nothing in the articles of association estopping the defendant (if such could be the case) from claiming the protection of the law, or authorizing this suit in the name of the plaintiff. (Lindley on Partnership, *721 ; *Hybart v. Parker*, 4 C. B. [N. S.] 209 ; *Evans v. Hooper*, 15 Eng. [Moak's ed.] 179 ; *Westcott v. Fargo*, 61 N. Y. 548.) The motion to dismiss the complaint should have been granted, because it does not show that defendant was a stockholder when the debts were contracted, to pay which the assessment was made. (Lindley on Partnership, *315–317, 319 ; *Westcott v. Fargo, supra ;* Parsons on Partnership, 433, 434 ; *Turner v. Jaycox*, 40 N. Y. 470 ; *Hart v. Tomlinson*, 2 Vt. 101 ; *Dyke v. Brewer*, 2 Car. & Kir. 828.) The defendant never became a partner or shareholder in the association, of which the plaintiff is the president, and for whose debts he is assessed. (Lindley

on Partnership, \*96 ; *Dougan's Case,* L. R., 8 Ch. App. 540 ; *Dixon* v. *Evans,* L. R., 5 House of Lords Cas. 606 ; *Shipley* v. *Angle,* 37 N. Y. 626 ; *Beck's Case,* L. R., 9 Ch. App. 392 ; *Garrison's Case,* L. R., 8 Ch. App. 507 ; *Dorris* v. *Sweeney,* 64 Barb. 636 ; *Central Bank* v. *Walter,* 66 N. Y. 424.) Defendant is not estopped from denying that he is a partner in the joint-stock company. (*Ellis* v. *Marshall,* 2 Mass. 269.) He is not estopped by any acts of his from proving that the contract between him and S turgis, on behalf of the promoters, was a conditional one, or from denying his ownership of shares in the joint-stock company. (*Payne* v. *Burnham,* 62 N. Y. 69 ; *Dessell* v. *Odell,* 3 Hill, 215 ; *Carpenter* v. *Stilwell,* 1 Kern. 61 ; *Duchess of Kingston's Case,* with Hare & Wallace's notes ; 2 Smith's Leading Cases on Estoppel, 645, etc.) It was a fraud upon the parties interested to proceed with the business of the company before the proposed capital was secured. (*Salem Mill Dam Co.* v. *Ropes,* 6 Pick. 23 ; *Newburyport Bridge* v. *Story,* id. 45 ; *Central Turnpike Co.* v. *Valentine,* 10 id. 142 ; *Proprietors Cabot and W. Springfield Bridge Co.* v. *Chapin,* 6 Cush. 50 ; *Worcester & Manhat. R. R. Co.* v. *Hinds,* 8 id. 110, 111 ; *Littleton Manuf. Co.* v. *Parker,* 14 N. H. 543 ; *Old Town & Lincoln R. R.* v. *Veasie,* 39 Me. 577 ; *N. H. Cent. R. R. Co.* v. *Johnson,* 10 Foster, 390 ; *Stoneham Bridge R. R. Co.* v. *Guild,* 2 Gray, 277.) The referee erred in admitting in evidence the stock ledger of the company, to prove that defendant was a stockholder. (*Fox's Case,* 3 De Gex, Jones & Smith, 464, 466.) The referee erred in admitting the books of the Butterfield Dispatch in evidence against Mr. Farwell. (*Hill* v. *Manchester Water Works Co.,* 5 Barn. & Ad. 866 ; Lindley on Partnership, 471 ; *Ocean Bank* v. *Carl,* 55 N. Y. 340 ; *White* v. *Ambler,* 4 Seld. 170.)

*John Winslow* for respondent. The directors had a right under the articles to impose an assessment on the stockholders to pay debts. (46 N. Y. 129 ; *Bray* v. *Farwell,* 3 Lans. 495 ; *Sands* v. *Gun,* 58 N. Y. 94.) The defendant being a stockholder of record, the assessment, if valid, reaches him. (*Turn*

*bull* v. *Parsons,* 5 Otto, 418.) A subscription in writing was not necessary. (*Nat. Bank* v. *Van Derwerker,* 74 N. Y. 234; 3 Biss. [U. S.] 431.) As between themselves, the shareholders are liable to pay the debts of the association, irrespective of the time when they became associates, and of the time when the debts were contracted. (32 N. Y. 501, 506; *Savage* v. *Putnam,* 25 id. 221; *Story* v. *Furman,* id. 266; *Wright* v. *Delafield.*) Agreements between partners, in their fundamental articles, and in many other cases, may be enforced at law, for the benefit of the partnership. (*Cross* v. *Jackson,* 5 Hill, 479; *Townsend* v. *Galway,* 19 Wend. 424; *Cole* v. *Reynolds,* 18 N. Y. 76; *Habicht* v. *Pemberton,* 4 Sandf. S. C. 657.) It is too late for stockholders, induced to become such by fraudulent statements in regard to the condition of the company, to seek to avoid liability on such grounds, after the company has become insolvent, and the investment has been found unprofitable. (Benj. on Sales, 336, 350, 352; *Oakes* v. *Tarquand,* 2 Eng. L.; Irish App. 325; Green's Brice's Ultra Vires, 258; *Upton* v. *Stansborough,* 3 Bliss, 417; *Gloucester Bank* v. *Salem Bank,* 17 Mass. 33; *Kelsey* v. *North. Light Oil Co.,* 45 N. Y. 505; *Ogilvie* v. *Morrill,* 20 Vt. 509; *Litchfield Bank* v. *Peck,* 29 Conn. 384; *Campbell* v. *Fleming,* 1 Ad. & E. 148.) If there were grounds for alleging deceit, the defendant is estopped, by his subsequent acts, from defending on that ground. (Lindley on Part., 330; *Plank Road Co.* v. *Rice,* 7 Barb. 159.) A person who has been induced to take shares by fraud, which is not imputable to the company, can not repudiate those shares as against it. (2 Lindley on Part. 842, 846, 848; 1 id. 241, 242, 446; 47 Md. 117; *Deposit Life Assurance Co.* v. *Ayscough,* 88 Eng. C. L. 761; 46 Md. 132.) A stockholder must pay all calls made whilst shares are registered in his name. (1 Lindley on Part., 446–447.) A verbal agreement to take stock was sufficient. (2 Lindley on Part., 581; 74 N. Y. 234.) An assessment by a joint-stock company will not be disturbed by the court, upon an allegation of insufficient basis, in the absence of fraud. (*Troy Iron Nail Factory* v. *Corning & Winslow,* 45 Barb. 231; affirmed in Ct.

of App., 40 N. Y. 191; *Sands, Rec., etc.* v. *Graves*, 58 id. 94; Lindley on Part. 635; *Morrissey* v. *Weed*, 19 Hun, 496.) The party on the register is liable for assessments so long as his name remains on the register. (Redfield on Railways, 68; *Case of L. I. R. R. Co.*, 19 Wend. 37; *Mann* v. *Currie*, 2 Barb. 294; 12 Conn. 530; 20 id. 178; 1 Kern. 148.) It was the duty of the directors of the company to make calls. (Redfield on Railways, 64, 71; 4 Exch. 540; 1 Lindley on Law of Part. 432, 439, 440.) The fact that the call was for more than was necessary to pay the debts of the company cannot be tried in an action against an individual stockholder. (3 Biss., [U. S.] 417; *Upton, Assignee,* v. *Hansborough.*) The shareholder's liability in a joint-stock company is that of a partner. (4 Abb. N. Y. App. 628; *Witherhead* v. *Allen*, 28 Mich. 412; 50 Barb. 160; *Bray* v. *Farwell*, 3 Lans. 508.) It was not necessary to have all the capital stock subscribed before an assessment could be laid. (*Small* v. *Herk. Manuf. Co.*, 2 Comst. 335; *Plank Road Co.* v. *Rice*, 7 Barb. 159; Lindley on Part. 438; *Hutt* v. *Giles*, 12 M. & W. 492.) The president had authority to sue in his own name as such. (*Fargo* v. *Mc Vicker*, 55 Barb. 437; *Bray* v. *Farwell*, 3 Lans. 495; Laws of 1849, chap. 258; *Westcott et al.* v. *Fargo*, 61 N. Y. 542; *Thompson* v. *Fargo*, 63 id. 479; *National Bank* v. *Van Der Werken*, 74 id. 234; 1 Robertson, 666.)

EARL, J. The Butterfield Overland Dispatch was a joint-stock company organized in the city of New York in March, 1865, for the purpose of carrying on an overland express business between eastern and western places in the United States. The capital of the company was to be $3,000,000, divided into 30,000 shares, of the par value of $100 for each share. After carrying on its business for a few months the company became largely indebted, and an assessment was made by its directors upon its stockholders, of $40 per share, to raise money to meet its liabilities. It is claimed that the defendant was a member of the company, owning 340 of its shares, and this action was brought against him by the plaintiff, as president

of the company, to recover the assessment on account of such shares.

The plaintiff, in prosecuting the action, does not represent the creditors of the company, and the action was not commenced on their behalf. He represents only the company, and prosecutes the action on its behalf to enforce an obligation claimed to be due to it. It is important only, therefore, in the consideration of this case, to take into account the relations of the defendant with, and his obligations to, the company.

I will assume what is strenuously contested by the defendant, that he was a member of this company, owning the 340 shares of its stock; and I will also assume, that the plaintiff, as president of the company, could, on its behalf maintain this action against the defendant, although a member thereof, if the alleged cause of action existed; and yet, upon the case as now presented, I find an insuperable and fundamental obstacle to the maintenance of the action. For reasons which I will proceed to state, the assessment was wholly unauthorized, and imposed no obligation upon the defendant.

· The plaintiff bases his right to recover in this action solely upon the assessment, and he can maintain his action only by showing that the assessment was legally binding upon the defendant. It is not claimed that there are any general principles of law applicable to partnerships or joint-stock companies which authorize an assessment of this kind, but the claim is that this assessment was authorized by the articles of association of this company. To them we must therefore look to determine the rights of these parties. Articles were drawn up and executed by the promoters of this company when it was organized in the city of New York. Article 2 provides that the capital stock of the company shall consist of 30,000 shares valued at $100 each, and that the number of the shares may, from time to time, be increased or decreased "whenever the board of directors may deem it for the best interests of said company, and shall so direct by a resolution of the board." There was no resolution changing the number of shares, and so the whole number of shares constituting the capital re-

mained as fixed in that article. That article also provides that "said shares" (meaning the shares constituting the capital stock) shall be represented by proper certificates in scrip, in which shall be specified the number of shares to which the holder is entitled, and that each share is subject to " such assessments as may be required to pay any losses, damages, expenses or liabilities, to which this company may be subject in the prosecution of its legitimate business;" and article 3 contains an agreement on the part of the shareholders " to pay and fully discharge any and all assessments which the directors hereinafter named are authorized to make and which they may at any time hereafter make, in accordance with the provisions herein contained." Article 4 provides that the property, business and good-will of the company " shall be vested in, controlled and managed by a board of directors, seven in num ber, and their successors, each of whom shall be the owner of and hold in his own right at least fifty shares therein, to be chosen by the stockholders as hereinafter provided," and seven persons are named as the first directors; and it is provided that the persons thus chosen shall be the directors until others are chosen in their stead, with power to fill all vacancies in the board. Article 5 provides that when shareholders owning two-thirds in amount of the shares of the company shall unite in a written request for an election of one or more directors, and shall present the written request to the secretary of the company, he shall call a meeting of the stockholders for the purpose of an election, and an election may then be held as prescribed. There is no other provision in the articles for the election of directors by the stockholders. Other articles confer the entire management of the business and property of the company upon the directors, and they are clothed with power at any time, " whenever they may deem it for the best interests of said company, by a unanimous resolution of the board, to dissolve said company, and, by themselves or their attorney, to settle and adjust the affairs thereof." I have thus called attention to the main features of the articles, so far as important for the present purpose. It will be seen that there is no pro-

vision authorizing the directors to commence the business for which the company was organized until the amount of the capital stock was subscribed for and taken. It was a company with a capital of $3,000,000 divided into 30,000 shares of $100 each, and it was of such a company that a person taking stock had the right to suppose he became a member. That large amount of capital was deemed necessary for the transaction of the business contemplated, and the agreement necessarily implied was that it should be secured as the basis of the business. Every stockholder had the right to demand for each share of his stock a certificate representing one-thirty-thousandth part of the property and business of the company, and subjecting him only in the same proportion to its liabilities and burdens. The assessments contemplated, which the stockholders authorized and agreed to pay, were assessments, not upon a portion of the capital stock, but upon the whole thereof. From the very nature of the case, until all the shares constituting the capital stock were taken, the company remained inchoate, and there was no authority on the part of the directors to prosecute the regular business of the company or incur obligations therein. The agreement on the part of every subscriber to stock was that he would become a member of a corporation with others who owned the balance of the stock. Now, there were only about fifteen thousand shares of the capital stock of this company at any time taken, upon which only fifty dollars per share were required to be paid and for which certificates for full-paid stock were issued. The large amount realized for this stock was in less than one year entirely lost, and in addition thereto indebtedness was incurred to the amount of about $450,000, for which this assessment was made. The defendant did not have any share in the management of the company. It does not appear that he ever attended a meeting of the stockholders, that he assented in any way to the commencement or prosecution of the business before the whole number of the shares was taken, or that he knew at any time before the assessment was made that they had not been taken. It cannot, therefore, be claimed that he was in any way bound by the acts of the di-

rectors. If they could commence the business and bind the shareholders when 15,000 shares were taken, they could do so when 500 were taken, and thus every share might represent one-five-hundredth part of the property of the company and be subject to the burdens in the same proportion. When the defendant took his shares he was informed that the capital was $3,000,000 divided into 30,000 shares of $100 each, and it was so stated in the certificates issued to him. It was also stated in his certificates that "the holder of each share is subject to the payment in future of such assessments as may be required in case of loss or other necessity, and to all the obligations and liabilities, and entitled to all the privileges of a member of the association, resting on each share represented by this certificate as fully as if he had signed the articles of association." The assessment here contemplated was one upon the entire capital stock consisting of 30,000 shares, and the obligations which he assumed for each share of his stock were such as were to be shared with him by the holders of all the other shares.

Where did the directors get the authority to commence the business of the company before all the shares were taken? I can find no basis for such authority. It is not implied from the nature of the company, or of the business to be prosecuted, and it cannot be inferred from the circumstances. They were chosen as the agents of all the shareholders, not as the agents of a portion of them. They had no authority to go on with insufficient means, and thus wreck the company. The obligations which they incurred bound them, but not the non-assenting stockholders; and a valid assessment could not be made upon stockholders to pay obligations which did not bind them.

While the conclusion thus reached is plainly sustained by sound reasons, it has also the sanction of ample authority.

The articles of association of an unincorporated joint-stock company bear the same relation to it that the charter bears to an incorporated company. They regulate the duties of the officers and the duties and obligations of the members of such a company among themselves; they specify the capital, limit the duration and define the business of the company; and hence

the decisions made in England in the cases of joint-stock com-
panies organized under statutes, and the decisions in the cases
of incorporated companies, may be referred to as authorities in
a case like this. In Wordsworth on Joint-Stock Companies,
318, it is said: " The amount of capital mentioned in the sta-
tute must have been subscribed before calls upon the share-
holders can be made or enforced. In such case, there is a con-
dition precedent to be satisfied before a shareholder can be
subjected to an action for a call." In Lindley on Partnership
(4th Lond. ed.), 626, it is said that *prima facie* the shareholders
of joint-stock companies are not bound to pay calls upon their
stock until the whole capital of the company has been sub-
scribed for, and that " in all the cases in which they were held
bound, the defendants had entered into a contract which pre-
cluded them from maintaining that the subscription of the
whole of the originally proposed capital was an express or im-
plied condition to their becoming shareholders.". In *Pitch-
ford* v. *Davis* (5 M. & W. 2), a company was organized with a
proposed capital of 10,000 shares of £25 each, and the defend-
ant took some of the shares. Directors of the company were
chosen, and they commenced the business of the company and
incurred debts when not more than 1,400 out of the 10,000
shares had been taken. In a suit by a creditor of the company,
the Lord Chief Baron told the jury that without evidence that
the defendant knew and assented to the business being carried
on with a smaller capital than that which was originally pro-
posed, he could not be bound by the contract of the directors,
and it was for them to say whether the business was so carried
on with his knowledge and consent. The jury having, under
this direction, found a verdict for the defendant, a motion was
made for a new trial in the Court of Exchequer and was re-
fused. Lord ABINGER, C. B., said: " The question is whether
the directors were the agents of the defendant in carrying on
the business with so small a capital. I thought at the trial,
and am still of the same opinion, that where a prospectus is
issued, and shares collected, for a speculation to be carried on
by means of a certain capital to be raised in a certain number

of shares, a subscriber is not liable in the first instance, unless the terms of the prospectus in that respect are fulfilled. But if it be shown that he knows that the directors are carrying on the undertaking with a less capital, and has acquiesced in their so doing, he may become answerable for their future contracts." PARKE, B., said : " The defendant, by taking shares in this speculation, gives authority to the directors to bind him by their contracts, in the event of the proposed number of shares being disposed of and the proposed capital obtained. The secretary, who gives the order to the tradesmen, is the party primarily liable ; the directors, also, who give the order to the secretary, may be liable. A third party may become liable, if it can be shown that he has authorized the act of the directors in making the contract. But by proving the defendant to be an original subscriber, unless the proposed capital is raised, no such authority is shown." ALDERSON, B., said : " The authority given by the subscribers to the directors is a conditional one, depending on the terms of the prospectus being fulfilled." (See, also, *Fox* v. *Clifton*, 6 Bing. 776.) *The Salem Mill Dam Corporation* v. *Ropes* (6 Pick. 23) is one of the leading and earliest cases upon this subject in this country. In that case the charter provided that the capital stock of the corporation should be 5,000 shares not exceeding $100 each. The defendant subscribed for twenty shares. Directors were chosen and the corporation was organized as required by its charter. After less than 3,000 shares of the stock were subscribed for, the directors commenced business and incurred obligations, and then made an assessment upon the shares to raise money, and the action was brought against the defendant to recover the assessment upon his shares ; and it was held that there could be no recovery. The defendant's subscription for the stock was in the ordinary form, agreeing to take the shares set opposite to his name, and agreeing " to pay all such legal assessments on each of said shares as shall be made by the future government of said corporation." PARKER, Ch. J., said : " If the subscription paper or contract had been in a form of words a little different, a question could hardly arise as

to its construction.    Suppose it had been : Whereas, it is proposed to raise a sum, not exceeding $500,000 for the purpose of erecting dams, etc., in the town of Salem, and the capital stock is divided into 5,000 shares, now we, the subscribers, agree to take the number of shares set against our names, and pay such sums as shall be assessed upon our shares.    What does this import, but that the subscriber to a share agrees to take and pay for one-five-thousandth part of the capital stock to be raised ?    Could he, in that case, by virtue of such contract, be held to pay a thousandth part ?    Certainly not."    He said further : " This question goes deep into the interests of those who embark in projects of improvement with the right to calculate upon a certain capital, and on their own liability to contribute toward raising it.    If, with the expectation of 500 associates, or shares in that proportion, those who represent 200 can assemble, agree to carry on the whole work, by a major vote of that number, and assess themselves and the rest, and these doings are binding on the minority, the effect will be to discourage such enterprises, and subscriptions to objects, which from their nature must be of doubtful success, will cease.    A man may be willing, from public motives alone, to take his chances upon a limited proportion of 5,000 shares of a capital stock, and altogether unwilling to adventure upon half that number."    In *Cabot and West Springfield Bridge* v. *Chapin and others* (6 Cush. 50), the defendants subscribed for stock and agreed to pay assessments made upon their shares by the directors of the corporation.    The subscription paper stated the capital stock to be in 400 shares of $100 each — $40,000.    After 387 shares were subscribed for, a meeting of the subscribers was held, at which the corporation was organized by the choice of directors and other officers.    The directors made certain assessments upon the shares, and the action was to recover such assessments ; and it was held that there could be no recovery, because the whole number of shares had not been subscribed. DEWEY, J., said : " The true construction of the contract of the defendants is that they were to take and pay for three shares in a stock company, the capital stock of which was to consist of

400 shares of $100 each. Before the making of the subscription by the defendants, the capital stock and the number of shares had been fixed by the corporation. The number of shares and the sum to be paid for each being thus fixed and inserted in the articles of subscription, the subscription was to that extent a conditional one; and every subscriber was at liberty to refuse to proceed with the proposed undertaking until the requisite number of shares had been taken. It might materially affect the interests of the subscribers whether the whole number of shares or a less amount was subscribed for; both as respects the assessments to be made upon the stock, and also as to the ability of the corporation to complete the bridge, and thus entitle themselves to tolls. The whole undertaking as to profit and loss to the subscribers might depend upon having the full amount of the capital taken up. Where the purpose of the subscribers to a stock is that of proceeding to the execution of the business of the company upon a partial filling up of the capital, and it is deemed expedient to levy assessments before the entire stock is taken up, there should be inserted a provision to that effect in the articles of subscription. In the absence of such a provision, it is necessary, before an individual subscriber can be charged upon his subscription, that the whole capital stock, or number of shares which constitute it, should have been taken up, or the party must have waived his right to insist upon that condition by his own acts." In *Stoneham Branch R. R. Co.* v. *Gould* (2 Gray, 277), SHAW, Ch. J., said: "It is a rule of law too well settled to be now questioned, that when the capital stock and the number of shares are fixed by the act of incorporation, or by any vote, or by law passed conformably to the act of incorporation, no assessment can be lawfully made on the share of any subscriber until the whole number of shares has been taken. This is no arbitrary rule. It is founded upon a plain dictate of justice and the strict principles regulating the obligation of contracts. When a man subscribes a share to a stock to consist of 1,000 shares, in order to carry on some designated enterprise, he binds himself to pay a thousandth part of the cost of such enterprise. If only 500

are subscribed for, and he can have no assurance which he is bound to accept that the remainder will be taken, he would be held, if liable to assessment, to pay a five-hundredth part of the cost of the enterprise, besides incurring the risk of an entire failure of the enterprise itself, and the loss of the amount advanced toward it." In *Littleton Manuf. Co.* v. *Parker* (14 N. H. 543), GILCHRIST, J., said: "The general question presented by the case is, whether any assessment for the general objects and purposes of the corporation could be made until the 500 shares in the (subscription) agreement were subscribed for. If this could be done, and the defendant could be compelled to pay assessments on his share, the result would be that instead of paying one-five-hundredth part of the whole capital stock, he would pay one one-hundred-and-thirty-eighth part of it, and if $13,800 should be insufficient to enable the corporation to proceed in its undertaking, as probably would be the case, all the money he might pay would be lost. The agreement provides, in express terms, that the capital stock shall be $50,000, and that it shall be divided into 500 shares, and the defendant has not become a party to any agreement providing that the capital stock shall be $13,800, and that the number of shares shall be 138." In *Oldtown & Lincoln R. R. Co.* v. *Veazie* (39 Me. 571), SHEPLEY, Ch. J., said: "The agreement is to take the number of shares of the capital stock, and that must have had reference to the capital stock required by the charter. The engagement was to take such a part of that capital. The shares to be assessed were the shares of that capital. The agreement to pay ' all such legal assessments on each of said shares,' was to pay them on shares of that capital. There must, therefore, have been such a capital stock obtained before the subscriptions could be binding, or any legal assessments could be made." (See, also, *Cent. Turn. Cor.* v. *Valentine*, 10 Pick. 142 ; *N. H. Cent. R. R.* v. *Johnson*, 30 N. H. 390; *Som. & Ken. R. R. Co.* v. *Cushing*, 45 Me. 524; *Worc. & Nash. R. R. Co.* v. *Hinds*, 8 Cush. 110; *Sandford* v. *Handy*, 25 Wend. 475.) The reasoning in the case from Wendell is quite applicable to this, and the principles which controlled the decision in that

case are sufficient for this.    There were, however, more but not stronger reasons for upholding the defense in that case than exist in this. The head-note to that case is as follows : " Where the owner of lands issued proposals for the establishment of a joint-stock company, in the purchase and sale of his lands, estimating the value of the property at a certain sum, and dividing it into twenty-three shares of a given value, each subscriber to be interested in the purchase to the extent of the number of shares taken by him, and the property to be controlled and disposed of by a majority of such persons as should become subscribers ; it was held that a subscriber for one or more shares was not liable for the amount of his subscription, unless the whole number of shares was taken up, and could not be compelled to become a tenant in common with the owner of the land, unless the whole scheme was carried into effect." (See, also, Green's Brice's Ultra Vires [2d ed.], 153, where many cases are collected in a note.)

These authorities, it must be admitted, are quite sufficient to sustain our conclusion, if applicable to the case of a joint-stock company organized as this was.    It will be seen, by a careful scrutiny of them, that they do not rest upon any principles solely applicable to corporations, or upon any limitations contained in the various charters under consideration.    As stated by Chief Justice SHAW, in *Stoneham Branch R. R. Co.* v. *Gould*, they rest " upon a plain dictate of justice and the strict principles regulating the obligation of contracts."    In them will be found an answer to every argument which has been, or, so far as I can perceive, could be made to uphold this assessment.

The learned counsel for the plaintiff has called our attention to two authorities to uphold his contention that this assessment could be made before all the shares were subscribed for. One is *The Hamilton and Deansville Plank Road Co.* v. *Rice* (7 Barb. 157), in which case the decision was based upon the provisions of the Plank Road Act and upon the peculiar language of the subscriptions, and nothing was decided in conflict with the views above expressed.    The other is *Hutt* v. *Giles*

(12 M. & W. 492), in which the deed of settlement which bound the stockholders provided that they would pay calls upon their stock, "notwithstanding the entire number of shares shall not be subscribed for."

The defendant became the lawful owner of the shares issued to him. He had paid for them, and he had the right to do with them as he willed. He could assign and dispose of them, and retain whatever he could get, without incurring the obligation now sought to be enforced against him. It matters not what he did with his stock, so long as he did not assent in some way that the directors should prosecute the business of the company, and incur obligations on its behalf before all the shares of the capital stock were subscribed for. The defendant, therefore, by dealing with his stock, did not in any way preclude himself from making the defense which we have considered.

Therefore, without considering many other points learnedly argued before us, our conclusion is, that the judgment should be reversed and a new trial granted.

All concur.

Judgment reversed.